**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 13-cr-00392-CMA

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.    George Thomas Brokaw,
2.    John J. Pawelski,
3.    Mimi M. Vigil, and
4.    Clara M. Mueller,

    Defendants.

---

**GOVERNMENT'S *JAMES* PROFFER**

---

1.    The United States of America (the government), submits this *James* proffer in accordance with the schedule and procedures discussed during the status conference on July 16, 2014. This proffer demonstrates (1) the existence of the conspiracy to file false claims for refunds charged in Count 1 and the conspiracy to corruptly endeavor to obstruct or impede the due administration of the internal revenue laws charged in Count 14 of the First Superseding Indictment, (2) the duration of these conspiracies, and (3) the participants in the conspiracies. The proffer also includes a preliminary list of out-of-court statements in furtherance of the two conspiracies which the government intends to offer at trial. The government may attempt to offer at trial additional statements, not currently in the government's possession or of which the government is not currently aware, which may be discovered in the course of trial preparation. If such statements

are discovered pre-trial, the government will request leave to file a supplemental list of additional out-of-court statements it intends to offer at trial.

## THE LAW CONCERNING RULE 801(d)(2)(E)

2.  According to the Federal Rules of Evidence, "[a] statement is not hearsay if [it] is offered against a party and is . . . a statement by a coconspirator of a party during the course of and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Statements are admissible pursuant to Rule 801(d)(2)(E) if a court finds, by a preponderance of the evidence, three things: (1) that a conspiracy existed; (2) that the declarant and the defendants against whom the statement is offered were members of the conspiracy; and (3) that the statement was made in the course of and in furtherance of the conspiracy. *United States v. Lopez-Gutierrez*, 83 F.3d 1235, 1242 (10th Cir. 1996); *United States v. Burnell*, 336 F. App'x 775, 777 (10th Cir. 2009) (unpublished) (citing *United States v. Sinclair,* 109 F.3d 1527, 1533 (10th Cir. 1997)).[1]

3.  In making these determinations, a court is not bound by the Rules of Evidence. *See* Fed. R. Evid. 104(a), 1101(d)(1). "[T]he district court has the discretion to consider any evidence, not subject to a privilege, including both the alleged co-conspirator statements and any other hearsay evidence, whether or not that evidence would be admissible at trial." *United States v. Owens*, 70 F.3d 1118, 1124 (10th Cir. 1995).

4.  To determine the first factor, whether a conspiracy existed, a court may consider the hearsay statement itself along with independent factors tending to establish the

---

[1] Although the cases discussed in this pleading addressed conspiracies charged under a variety of conspiracy statutes, the analysis of Rule 801(d)(2)(E) issues is the same regardless of the particular conspiracy statute charged.

conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 181 (1987); *United States v. Hernandez*, 829 F.2d 988, 995 (10th Cir. 1987). The government is not required to show that a formal or explicit agreement existed, *United States v. Dumas*, 688 F.2d 84, 86 (10th Cir. 1982), but it must provide evidence of four things: (1) an agreement between two or more people to break the law; (2) knowledge by those people of the essential objectives of the conspiracy; (3) knowing and voluntary participation in the conspiracy; and (4) interdependence among the conspirators, *United States v. Eads*, 191 F.3d 1206, 1210 (10th Cir. 1999). The element of illegality of the conspiracy's purpose need not be demonstrated by independent evidence but may be proven by the conspirators' own statements. *United States v. Bucaro*, 801 F.2d 1230, 1232 (10th Cir. 1986).

5.     To determine the second factor, the connection of the declarant and the defendants to the conspiracy, a court may presume that a defendant is a knowing participant in a conspiracy when he acts in furtherance of the conspiracy's objective. *See United States v. Tranakos*, 911 F.2d 1422, 1430 (10th Cir. 1990); *United States v. Savaiano*, 843 F.2d 1280, 1294 (10th Cir. 1988). Only "slight evidence" is needed to make this determination. *United States v. Medoza-Salgado*, 964 F.2d 993, 1005-06 (10th Cir. 1992).

6.     Once a defendant joins a conspiracy, statements made by coconspirators even before the defendant joined are admissible against that defendant. *United States v. Brown*, 943 F.2d 1246, 1255 (10th Cir. 1991). The government is not required to prove that a conspirator knows all other conspirators, *United States v. Evans,* 970 F.2d 663, 669-70 (10th Cir. 1992), nor that a conspirator knew of or participated in every aspect of

the conspiracy, *Eads*, 191 F.3d at 1210.  A coconspirator statement is also admissible even if the declarant is uncharged, *United States v. Davis*, 766 F.2d 1452, 1458 (10th Cir. 1985); *United States v. Manaman*, 606 F.2d 919, 926-27 (10th Cir. 1979); *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1081 n.5 (10th Cir. 2006), or if it was made outside the presence of the defendant(s) against whom it is being offered. *United States v. Cotton*, 646 F.2d 430, 433 (10th Cir. 1981).

7.      In determining the third factor, that the statement was made during the course of and in furtherance of the conspiracy, several rules apply.  First, the focus is on whether the declarant's intent in making the statement was to advance the conspiracy, not whether the statement actually advanced the conspiracy.  *United States v. Perez*, 989 F.2d 1574, 1578 (10th Cir. 1993).  To determine this, the court must examine the nature of the statement and its context.  *Id.* at 1579.  Second, there is no requirement that the statement be made by one conspirator to another.  *United States v. Williamson*, 53 F.3d 1500, 1519 (10th Cir. 1995); *United States v. LeRoy*, 944 F.2d 787, 789 (10th Cir. 1991); *United States v. Falls*, 90 F. App'x 351, 356 (10th Cir. 2004) (unpublished). Statements made to a government agent, for example, are admissible if they were made to further the conspiracy.  *Williamson*, 53 F.3d at 1519; *Falls*, 90 Fed. App'x at 356.  Third, a statement may be admissible, even if subject to alternative interpretation, if a reasonable interpretation of the statement is consistent with an intent to promote the conspiracy.  *Garlington v. O'Leary*, 879 F.2d 277, 286 (7th Cir. 1989).  Examples of statements made in furtherance of a conspiracy include but are not limited to:

   a.   Statements which in any way promote the objective(s) of a conspiracy.
        *United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007) (citing *United*

*States v. Reyes*, 798 F.2d 380, 384 (10th Cir. 1986)); *United States v. Peveto*, 881 F.2d 844, 852 (10th Cir. 1989); *United States v. Falls*, 90 Fed. App'x 351, 356 (10th Cir. 2004) (unpublished).

   b.    Statements which reveal the existence of a conspiracy. *United States v. Garcia*, 994 F.2d 1499, 1505 (10th Cir. 1993); *United States v. Mayberry*, 896 F.2d 1117, 1121 (8th Cir. 1990).

   c.    Statements to new or prospective members of a conspiracy which explain the conspiracy. *United States v. Turner*, 871 F.2d 1574, 1581 (11th Cir. 1989); *United States v. Monroe*, 866 F.2d 1357, 1363 (11th Cir. 1989);

   d.    Statements which are intended to recruit potential coconspirators or to otherwise induce others to assist in carrying out the objectives of the conspiracy. *United States v. Lujan*, 936 F.2d 406, 411 (9th Cir. 1991); *United States v. Heinemann*, 801 F.2d 86, 95 (2d Cir. 1986).

   e.    Statements which identify a conspirator or the role of a conspirator. *Townley*, 472 F.3d at 1273 (10th Cir. 2007) (citing *United States v. Handy*, 668 F.2d 407, 408 (8th Cir.1982)); *Williamson*, 53 F.3d at 1519; *United States v. Gomez*, 810 F.2d 947, 953 (10th Cir. 1987).

   f.    Statements which explain important events in the conspiracy. *Townley*, 472 F.3d at 1273 (citing *United States v. Smith*, 833 F.2d 213, 219 (10th Cir.1987)); *United States v. Massa*, 740 F.2d 629, 638 (8th Cir. 1984).

   g.    Statements which are designed to give directions to facilitate the objectives of the conspiracy. *Massa*, 740 F.2d at 638.

   h.    Statements which are designed to advise coconspirators of the progress

of the conspiracy and keep them abreast of activities associated with the conspiracy. *Townley*, 472 F.3d at 1273 (citing *United States v. Gomez*, 810 F.2d at 953); *United States v. Smith*, 833 F.2d 213, 219 (10th Cir. 1987); *United States v. Simmons*, 923 F.2d 934, 945 (2nd Cir. 1991); *United States v. Gibbs*, 739 F.2d 838, 845 (3rd Cir. 1984).

i. Statements which are intended to assure the listener of a conspirator's ability to consummate a particular transaction. *United States v. Echeverry*, 759 F.2d 1451, 1457 (9th Cir. 1985);

j. Statements which are designed to gain the trust of other conspirators or potential conspirators, to reassure trustworthiness, or to allay suspicions or fears. *Townley*, 472 F.3d at 1273; *Williamson*, 53 F.3d at 1520; *Gomez*, 810 F.2d at 953.

k. Statements which are intended to control damage to the conspiracy. *United States v. Doerr*, 886 F.2d 944, 951 (7th Cir. 1989); *United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988);

l. Statements which prompt the listener to respond in a way that facilitates carrying out the activities of the conspiracy. *United States v. Rahme*, 813 F.2d 31, 35 (2d Cir. 1987);

m. Statements which conceal the objective of the conspiracy. *Doerr*, 886 F.2d at 951;

n. Statements which are intended to enhance a coconspirator's usefulness to the conspiracy. *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988);

      o.      Statements which set in motion acts that are an integral part of the conspiracy. *United States v. Paris*, 827 F.2d 395, 400 (9th Cir. 1987); and

      p.      Statements which constitute "puffing," *United States v. Krevsky*, 741 F.2d 1090, 1095 (8th Cir. 1984), or "boasting," *United States v. Johnson*, 872 F.2d 612, 615 (5th Cir. 1989); *United States v. Santiago*, 837 F.2d 1545, 1549 (11th Cir. 1988), in promotion of the conspiracy.

Although not all of these examples may have relevance to this case, the size of this list is illustrative of the broad interpretation given to statements in furtherance of a conspiracy.

8.    The Tenth Circuit has expressed a preference for making determination of the existence and scope of a conspiracy be made prior to trial, but this Court can make a determination of the existence of the proffered conspiracies on the basis of this pleading and its attachments without holding a separate evidentiary hearing. *See United States v. Urenas*, 27 F.3d 1487, 1491 (10th Cir. 1994) (noting that a *James* hearing might have been unnecessary based on previously presented evidence establishing the existence of a conspiracy). Nevertheless, the government will be prepared to present additional testimony or other evidence as necessary at the hearing scheduled on this issue.

9.    If the Court finds that any of the people identified as conspirators in this proffer were not knowing participants in the conspiracy, those people should be considered agents of the conspirators. As agents, their statements and acts are admissible against all knowing participants in the conspiracy or scheme. *United States v. Krohn*, 573 F.2d 1382, 1386-87 (10th Cir. 1978).

**PROFFERED EVIDENCE CONCERNING THE CHARGED CONSPIRACIES**

10.     The evidence described below will demonstrate that the conspiracy to file false claims for refunds charged in Count 1 of the First Superseding Indictment began in or around October, 2008 and continued through in or about May, 2009.  The conspiracy to corruptly endeavor to obstruct the due administration of the internal revenue laws charged in Count 14 began in or around March, 2008 and continued through in or about April, 2012. The charged defendants were members of both conspiracies.  The first conspiracy had an additional, unindicted member, Curtis Morris.  Morris was previously convicted of mail fraud in violation of 18 U.S.C. § 1341 in the United States District Court for the District of Colorado, criminal case number 10-cr-00317-REB-01, in connection with a scheme to submit tax returns with fraudulent Forms 1099-OID.

11.     The sources of information relied upon for this proffer include reports of witness interviews, reports of interviews of some of the defendants, reports concerning investigative activity by an undercover agent, grand jury testimony, documents provided by financial institutions and businesses referenced in defendants' tax filings, documents and filings sent by the defendants to the IRS and the Department of the Treasury, and evidence obtained during the searches of 2260 Palm Drive, #C (Mr. Brokaw's residence) and 513 Shady Crest Circle (Mr. Pawelski's and Ms. Vigil's residence), both located in Colorado Springs, Colorado, and the search of 5996 Pine Ridge Drive, Elizabeth, Colorado (Mr. Morris's residence).  Although this proffer describes the majority of the significant aspects of and acts associated with the conspiracy, it does not purport to describe every aspect of the conspiracy or every act taken in furtherance of it.

Overview of the Conspiracy to File False Claims for Refund

12.     The defendants worked together and assisted each other in the filing of false claims for refund submitted to the IRS for tax years 2003 through 2008.  Specifically, Mr. Brokaw filed six false claims for tax years 2003-2008 totaling $358,218, Exhibit 1, and Mr. Pawelski filed four false claims for tax years 2004-2007 totaling more than $22 million, Exhibit 2.  Ms. Vigil filed one $372,169 false claim for tax year 2005, Exhibit 3, and Ms. Mueller filed one $382,530 false claim for tax year 2005, Exhibit 4.  This conspiracy began in approximately October, 2008, when the conspirators began discussing these returns, and when Mr. Pawelski's returns were filed, and continued through at least May, 2009, when the last of Mr. Brokaw's returns were filed.

13.     All of the defendants' false claims for refunds were based on similar false Forms 1099-OID submitted in connection with their tax returns.  These Forms 1099-OID falsely reported that financial institutions, lenders, or other entities had withheld and paid over to the IRS interest income from accounts in their names, including mortgages, credit card accounts, and checking accounts.  In fact, representatives from these financial institutions, lenders, and other entities will testify at trial that these accounts did not generate such income and no such withholdings occurred from these accounts.  The tax returns filed by the defendants nevertheless claimed false refunds based on these false claims of withholdings.

14.     IRS records and testimony from IRS employees will demonstrate that the defendants assisted each other in the filing and submission of the false claims for refunds in the following ways:

    a.     In February, 2009, Mr. Brokaw submitted to the IRS false hand-written

Forms 1099-OID claiming false OID income for the years 2003-2008. Ms. Mueller mailed these forms to the IRS for Brokaw. Exhibit 5.

b.  A few months later, Mr. Brokaw submitted to the IRS a second set of false Form 1040 tax returns and Forms 1099-OID claiming false OID income for the years 2003-2008. Ms. Vigil signed an "Affidavit of Notary Presentment" certifying that Brokaw appeared before her on May 1, 2009, with the false tax returns and Forms 1099-OID for the years 2003-2008, and that she mailed these false claims to the IRS for Brokaw. Exhibit 1.

c.  In May, 2009, Ms. Mueller certified that she mailed an additional copy of Vigil's 2005 Form 1040 tax return to the IRS. Ms. Mueller also notarized Ms. Vigil's signature on a document entitled "Power of Attorney" that was submitted with this copy of Ms. Vigil's 2005 Form 1040 tax return. Exhibit 6.

15. Emails obtained as a result of the search warrants described in paragraph 11 above demonstrate that the defendants and Mr. Morris communicated between themselves via email in late 2008 through early 2009 about using these Form 1099-OIDs to support false refund claims. These emails included, but are not limited to, the following:

a.  When the IRS erroneously gave Mr. Brokaw a $62,607 credit toward earlier tax years' liabilities based upon his 2008 return filed with a false 1099-OID, Mr. Brokaw emailed Mr. Morris with that news and suggested that Mr. Morris "should put this info plus the other victories out in a[n] E-MAIL message." Exhibit 7. (The IRS discovered its error and reversed the credit.)

b.  Mr. Pawelski asked Mr. Morris to review a document Mr. Pawelski drafted

in response to penalties assessed by the IRS for false returns filed by Mr. Pawelski.  Mr. Morris responded that it "[l]ooks pretty good from here," and told Mr. Pawelski to "[l]et her rip."   Mr. Pawelski reminded Mr. Morris that this was a document that Mr. Morris had sent to Mr. Pawelski a while ago and Mr. Pawelski "just tweaked it to fit [his] status.  Thanks for the overview."   Exhibit 8.

c.	Mr. Morris emailed Ms. Mueller that he would "create 6 1099 OID's and get them in the mail if this seems correct to you."  Mueller responded, "The number seems correct; you're working from what I gave you and I can document my end.  So go for it!"  Exhibit 9.

d.	Ms. Mueller asked Mr. Morris if she and Mr. Morris could "still file the 1040 along with the OID" when her "only income was a tiny amount of dividend income but [she] had two auto loans and bank statements."  Exhibit 10.

e.	Mr. Pawelski told Mr. Morris that he had the "2008 1099OID ready for you to process," and that Mr. Pawelski would bring his "paperwork" with him when the two were scheduled to meet.  Exhibit 11.

f.	In another email, Mr. Pawelski told Mr. Morris that he needed "OID for these" and provided Mr. Morris with the addresses and alleged tax ID/EINs for Bank of America and Chase Credit Company.  Exhibit 12.

g.	Ms. Mueller sent "2005 OID Additions" to Mr. Morris, which included information for Carrington Mortgage Services, the entity listed in the false 1099-OID Ms. Mueller submitted to the IRS with respect to her 2005 return.  Exhibit 13.

h.	Mr. Morris told Ms. Vigil that "I have put together an 05 return with the OID from the Mistar Financial, which has already been sent in.  In filling out the 05

return with this as taxable it gives a refund of $251,481.00.  If this then gets processed and they deduct even the whole amount that they had estimated at 25K then you would get a refund of about 220K for 05." Ms. Vigil responded, "I am ok with filing as taxable, then later oiding the taxes paid to get them back. . . . I would love to get 220K back for 05!  Let's go with that for now and see what happens." Exhibit 14.

i.     Mr. Pawelski provided Mr. Morris with a list of entities for the creation of OIDS.  When Mr. Morris responded that he did not have all of the information, Mr. Pawelski responded that he would "create the oid data for the missing documents and email them to you." Exhibit 15.

### Overview of the Conspiracy to Corruptly Endeavor to Obstruct or Impede the Due Administration of the Internal Revenue Laws

16.    The defendants also worked together to engage in conduct designed to impede the IRS's efforts to collect taxes owed by the defendants and others.  These efforts included mailing to the IRS and to the Department of Treasury a number of false documents which purported to pay the taxes owed by these defendants and others.  These documents had titles such as "Private Registered Bonds for Setoff," "Private Registered Indemnity Bonds," "Registered Private Offset and Discharge Bonds," and "Registered Bonded Promissory Notes."  The United States will prove they were received by the IRS and the Department of Treasury through testimony from representatives of both of those agencies.  The defendants also attempted to use other similarly fraudulent documents for the same purpose, including IRS documents on which they added handwritten text such as "money order" or "accepted for value," as

well as purported electronic funds transfer (EFT) instruments, which were really just checks drawn on closed bank accounts.  Ms. Vigil explained to Mr. Morris the obviously fraudulent nature of the payments purportedly submitted by the defendants in a December 1, 2008 email, where she said that if you "privatize" an account, "then you should be able to use it to access your unlimited treasury set off account.  That means you write checks on the account, and the bank has to honor them or 'pay' whoever you write the checks to, but you don't have to deposit any funds in the account!!  What a deal . . . ."  Exhibit 16.

17.     The defendants also attempted to impede the IRS by working together to file false and fraudulent liens or other documents, which falsely claimed that IRS employees who were engaged in legitimate tax collection efforts against one or more of the defendants owed one or more of the defendants amounts of money ranging from tens of millions of dollars to billions of dollars.  As explained below, this conspiracy existed from March, 2008, through April, 2012.

18.     Examples of this obstructive conduct include, but are not limited to, the following:

    a.     In March of 2008, Mr. Pawelski submitted to the IRS a packet of documents, including a 2004 U.S. Nonresident Alien Income Tax Return, along with copies of notices of federal tax liens filed against him on which he had hand-written "accepted for value."  Mr. Pawelski also claimed that he earned no income on this tax return.  Ms. Vigil certified that she mailed this packet of documents to the IRS for Mr. Pawelski.  Exhibit 17.

    b.     Between March and April of 2009, Mr. Brokaw, Mr. Pawelski, and Ms. Vigil each submitted to the Department of the Treasury a document entitled "Private

Registered Bond for Setoff," payable to the Department of Treasury, in the amount of $100 Billion. These documents directed, among other things, that the Department of the Treasury use the $100 Billion to "adjust any bills, taxes, or claims, and the like . . . to zero, charge, settle and close any such account and return the interest" to the respective defendant. One or more of the defendants signed these documents either as a surety, witness, and/or certified that he or she mailed the document for the respective defendant to Timothy Geithner, Secretary of the Treasury. Exhibits 18, 19, 20.

c.      On April 20, 2009, Ms. Vigil submitted to Timothy Geithner, Secretary of the Treasury, a document entitled "Private Registered Indemnity Bond," in the amount of $300 Million. The alleged purpose of this document was ". . . [u]nderwriting, insuring, and indemnifying" Ms. Vigil "against any and all preexisting, current, and future liabilities . . . ." Mssrs. Brokaw and Pawelski signed this document as sureties, and Ms. Mueller certified that she mailed this document to Geithner for Ms. Vigil. Exhibit 21.

d.      On June 2, 2009, Ms. Vigil submitted to Timothy Geithner, Secretary of the Treasury, a document entitled "Registered Private Offset and Discharge Bond" in the amount of $300 Million. The alleged purpose of this document was to "offset all pre-existing and current liabilities" in Ms. Vigil's name. Mssrs. Brokaw and Pawelski signed this document as sureties, and Ms. Mueller certified that she mailed this document to Geithner for Ms. Vigil. Exhibit 22.

e.      In an email dated June 27, 2009, from Mr. Pawelski to Ms. Mueller, Ms. Vigil, and Mr. Brokaw, and others, Mr. Pawelski provided a copy of updated

14

forms for the types of fraudulent bonds described above. Exhibit 23.

f.      On November 16, 2009, Mssrs. Brokaw and Pawelski signed as sureties on a "Private Registered Bond for Setoff" in the amount of $100 Billion submitted to the Department of the Treasury by an associate, W.R.[2], in purported settlement of W.R.'s tax debt. Exhibit 24.

g.      On December 2, 2009, Ms. Vigil submitted a packet of documents including a $62,435.95 "Registered Bonded Promissory Note" to IRS Revenue Officer T.P. and an IRS Form 56 appointing Timothy Geithner, Secretary of the Treasury, as her fiduciary. The purpose of this document allegedly was to satisfy a federal tax lien, interest, penalties and fees levied against Ms. Vigil's Shady Crest residence. Ms. Mueller certified that she mailed these documents to the IRS for Ms. Vigil. Exhibit 25.

h.      On December 7, 2009, Ms. Pawelski submitted a packet of documents including a "Registered Bonded Promissory Note" for $767,551.15 and an IRS Form 56 naming Timothy Geithner, Secretary of the Treasurer, as Mr. Pawelski's fiduciary to the personal residence of IRS Revenue Officer G.W. to settle the tax liability of one of Mr. Pawelski's associates, N.B. Ms. Vigil certified that she mailed these documents for Mr. Pawelski to G.W.'s personal residence. Exhibit 26.

i.      On February 5, 2010, Mr. Brokaw signed and submitted to IRS employee M.G., who had been involved in attempting to collect taxes owed by Mr. Brokaw,

---

[2] Individuals not named as conspirators in the First Superseding Indictment or otherwise criminally charged are referred to by initials only to protect their privacy.

15

a "Final Notice of Default and Demand for Payment" in the amount of $72,000,000 based on M.G.'s alleged libel of Mr. Brokaw. Ms. Mueller certified that she mailed the Notice of Default for Mr. Brokaw and notarized his signature on it. Exhibit 27.

j.  On March 24, 2010, Mr. Brokaw, accompanied by Mr. Pawelski and Ms. Vigil, hand-delivered to the IRS copies of Notices and Maritime liens against IRS employees M.P. and M.G., who had both been involved with attempts to collect taxes owed by Mr. Brokaw. The lien against M.P. claimed damages, interest, penalties and fees in the amount of $1,126,650,000. The lien against M.G. claimed damages, interest, penalties and fees in the amount of $2,232,000,000. Ms. Mueller notarized Mr. Brokaw's signatures on these liens. Exhibit 28.

k.  Between May 2, 2011, and May 16, 2011, Mr. Brokaw submitted a packet of documents to the IRS: 11 IRS payment vouchers addressed to him stating the amounts he owed to the IRS, and one life insurance policy statement. Mr. Brokaw wrote over each of these documents, labeling them as "Money Orders" payable to the IRS to be credited against his outstanding tax liability. Ms. Mueller notarized Mr. Brokaw's signature on the letter Mr. Brokaw submitted with these documents. Exhibit 29.

l.  On January 13, 2012, Mr. Pawelski submitted a letter to the IRS claiming that his tax debts had been discharged by an enclosed, purported EFT instrument dated December 5, 2011, in the amount of $132,000. This instrument was actually a check drawn on a closed bank account. Exhibit 30.

m.  On February 24, 2012, Ms. Mueller submitted a letter to the IRS claiming

that her tax debts had been discharged by an enclosed, purported EFT instrument dated February 24, 2012, in the amount of $16,489.25. This instrument was actually a check drawn on a closed bank account. Exhibit 31.

n.     On March 13, 2012, Mr. Brokaw mailed a letter to the IRS in which he referenced and enclosed earlier filings with the IRS and claimed that his tax debts had been discharged by an enclosed, purported EFT instrument dated November 20, 2011, in the amount of $522,692.48. This instrument was actually a check drawn on a closed bank account. Exhibit 32.

o.     On April 26, 2012, Mr. Brokaw submitted to the United States District Court for the District of Colorado a purported EFT instrument dated April 26, 2012, in the amount of $5,978,973. This instrument, which was submitted in an attempt to satisfy a judgment from a tax case filed against an associate of Mr. Brokaw's, was also a check drawn on a closed bank account. Exhibit 33.

**DESCRIPTION OF STATEMENTS IN FURTHERANCE OF THE CONSPIRACY**

19.    The charts attached to this proffer, titled James Log-286 (Exhibit 34) and James Log-371 (7212) (Exhibit 35), summarize the coconspirator statements made in furtherance of each of the conspiracies charged in Counts 1 and 14 of the First Superseding Indictment and described in this proffer. The letters following the 801(d)(2)(E) entries in the "Admission Bases" column refer to the subparagraphs of paragraph 7 above, which identify purposes for which the coconspirator statements may be offered. In some instances, multiple copies of the same statement were obtained from different locations. In those instances, the logs list multiple Bates numbers for those statements.

20.     The government may seek to offer some or some portions of the statements listed in the charts pursuant to Rules of Evidence other than 801(d)(2)(e), but it has included the statements in its logs out of an abundance of caution.  In fact, many of the statements may not be hearsay under the Rules of Evidence.  Statements made by a defendant are not hearsay when offered against him, Fed. R. Evid. 801(d)(2)(A), nor are statements hearsay if made by a party-opponent's agent, Fed. R. Evid. 801(d)(2)(D).  If declarants testify, their prior statements may not be hearsay.  See Fed. R. Evid. 801(d)(1).  Other hearsay exceptions may also apply to the listed statements.  See Fed. R. Evid. 803.  The government may offer some of these statements, or at least some portion of the statements, as verbal acts or directions rather than as assertions of fact.  As such, these statements would not be covered by the hearsay rules.  See Fed. R. Evid. 801(a); *United States v. Jackson*, 88 F.3d 845, 847-48 (10th Cir. 1996).  Questions are also generally not hearsay because they are not intended as assertions.  *Jackson*, 88 F.3d at 848.  Finally, portions of some of the statements will be offered simply to prove that the statements were made, not to prove the truth of the matters asserted.  See Fed. R. Evid. 801(c); *see generally* John W. Strong, *McCormick on Evidence* § 249 (7th Ed., 2014 Supp).

21.     Many of the statements identified in the logs were made in the same or substantial similar format either to multiple witnesses or in multiple documents.  At trial, the government may offer minor variations of statements identified in the logs which the Court determines are admissible.

22.

Respectfully submitted this 14th day of August, 2014,

                JOHN F. WALSH
                United States Attorney

                *s/ Matthew T. Kirsch*
                MATTHEW T. KIRSCH
                MARTHA A. PALUCH
                Assistant U.S. Attorneys
                1225 17th Street, Suite 700
                Denver, CO 80202
                Telephone 303-454-0100
                Facsimile 303-454-0402
                Matthew.kirsch@usdoj.gov
                Martha.paluch@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of August, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:


John S. Tatum, Esq.
john@johntatumlaw.com
Attorney for Mimi M. Vigil

Miller Leonard, Esq.
miller@themillerleonardlawfirm.com
Attorney for Clara M. Mueller


I hereby certify that on this 14th day of August, 2014, I mailed the foregoing to the following addresses:

Mr. George T. Brokaw
2260 Palm Drive
Colorado Springs, CO 80918

Mr. John J. Pawelski
P.O. Box 75341
Colorado Springs, CO 80970-5341


                                                s/ *Dee Boucher*_____
                                                United States Attorney's Office