1

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF COLORADO

3   Case No. 13-cr-00392-CMA

4   ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

5   UNITED STATES OF AMERICA,

6        Plaintiff,

7   vs.

8   GEORGE T. BROKAW, JOHN J. PAWELSKI, and MIMI M. VIGIL,

9        Defendants.

10  ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

11       Proceedings before KATHLEEN M. TAFOYA, United

12  States Magistrate Judge, United States District Court for

13  the District of Colorado, commencing at 12:34 p.m., November

14  7, 2014, in the United States Courthouse, Denver, Colorado.

15  ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

16       WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17  ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18  ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

19                    APPEARANCES

20       MATTHEW KIRSCH and MARTHA PALUCH, Assistant United

21  States Attorneys, appearing for the government.

22       GEORGE T. BROKAW, JOHN J. PAWELSKI, and MIMI M.

23  VIGIL, the defendants herein, appearing pro se.

24  ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

25                  DETENTION HEARING


AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 460, DENVER, CO  80203
303-825-6119

2

1                    P R O C E E D I N G S

2                    (Whereupon, the within electronically recorded

3          proceedings are herein transcribed, pursuant to order of

4          counsel.)

5                    THE CLERK: All rise.  Court is in session.

6                    THE COURT: Good afternoon, everyone.  Please be

7          seated.

8                    All right.  We are here in Case No. 13-cr-392,

9          United States of America versus George Thomas Brokaw, John

10         J. Pawelski, and Mimi M. Vigil.  May I have appearances for

11         the government, please.

12                   MR. KIRSCH: Good afternoon, Your Honor.  Matthew

13         Kirsch and Martha Paluch appearing for the United States.

14                   THE COURT: All right.  And let's see, Mr. Brokaw,

15         are you here?  Is that you, sir?

16                   DEFENDANT BROKAW: Yes.  Yes, Your Honor.

17                   THE COURT: And Mr. Pawelski?  Am I saying that

18         right?

19                   DEFENDANT PAWELSKI: You are saying that right,

20         yes, ma'am.

21                   THE COURT: All right.  And Ms. Vigil?

22                   DEFENDANT VIGIL: (No audible response).

23                   THE COURT: We're here today, as I understand it,

24         because you had a trial in front of Judge Arguello.  From

25         what I'm told, obviously I wasn't there, the jury has

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 460, DENVER, CO  80203
303-825-6119

1   returned verdicts finding each of you guilty, and so Judge

2   Arguello has referred this matter back to me for

3   reconsideration of your bond, whether or not you should be

4   continued on bond or not.   So is that the correct posture?

5          MR. KIRSCH: It is, Your Honor.

6          THE COURT: All right.  Let me just read to all of

7   you, since you are here pro se, what happens once you are

8   convicted is that the statute changes on bond.  You were

9   presumed innocent, obviously.  Or I guess, actually, more

10  correctly, you're presumed not guilty.  But now that a jury

11  has found you guilty as charged -- and it's my understanding

12  that there is jail time associated with the charges?

13         MR. KIRSCH: Your Honor, our estimate of the

14  guideline range, depending on how the calculations occur,

15  would put each of these defendants somewhere between and

16  three and ten years, approximately.

17         THE COURT: All right. Now, the government's

18  estimation of guideline calculations has -- you know,

19  doesn't mean that that's what Judge Arguello would do.  It's

20  kind of like when you first came into court and you get

21  advised of the maximum penalties, that doesn't mean you'll

22  get the maximum penalties, that's just their estimation of

23  what the guidelines say.  Judge Arguello has complete

24  control over what the sentence is, but because this is your

25  posture as you stand here now, you are here under Section --

1     Title 18, U.S.C. 3143, and what happens is the standard

2     changes.  What this says is:  Upon release or detention

3     pending sentence, which is where you all are, the judicial

4     order -- officer shall order that a person who has been

5     found guilty of an offense and who is awaiting imposition or

6     execution of sentence be detained unless the judicial

7     officer finds by clear and convincing evidence that the

8     person is not likely to flee or pose a danger to the safety

9     of any other person or the community if released on bond.

10     So instead of the government having to prove that

11     you are a risk of flight or a danger to the community, you

12     now have to convince me that you're not those things;

13     otherwise, I have to detain you, that's what the statute

14     says.  So that's why we're here.

15     Is that a fair summation of why you think we're

16     here?

17     MR. KIRSCH: It is, Your Honor, and we did -- we

18     did specifically request remand of the defendants before

19     Judge Arguello as well, and we are -- we are maintaining

20     that position here.

21     THE COURT: All right.  So that's the -- that's the

22     position of the government.  Now, we can have a hearing on

23     this today.  You know, I have to rely on you, if you want to

24     present evidence or argument or anything like that, to meet

25     this burden on your side.  We can delay this for a day or

1    two if you want some time to prepare, but you have to remain

2    in custody during that time, so that means you won't be out

3    on bond anymore, so I can leave this somewhat up to you.  I

4    don't see any specified time, like in 3142 the three-day

5    time limit, but do you want to have a hearing today on these

6    issues?

7         DEFENDANT PAWELSKI: This is John Joseph Pawelski.

8    I -- I don't have a problem having a hearing today, ma'am.

9         THE COURT: All right.

10        DEFENDANT PAWELSKI: I am not a flight risk,

11   though.  I mean, I've done everything I could possibly do as

12   far as probation and meeting the standards which were put

13   together originally last year.

14        THE COURT: All right.

15        DEFENDANT PAWELSKI: I'm a solid member of the

16   community, and have no real means, if you will, to be

17   leaving, so I -- first of all, I don't know where I would

18   go, and, second of all, I did file a Writ of Mandamus this

19   morning for an appeal, so I believe the court system will --

20   will find that I -- my standing is -- is correct and I'll be

21   vindicated in the near future, and it would be just a whole

22   lot easier to be able to put that together not being

23   incarcerated, and I don't know how to -- I don't know how to

24   prove that except that I've kept my word throughout this

25   process of when I would be at certain spots and not.

6

1          Mr. Kirsch is going to tell you about a man named
2      of Ron Hoodenpyle who left.   Ron Hoodenpyle is not my
3      favorite person.  He -- he was convicted and was supposed to
4      put himself in Texas.  Me and five of my friends, including
5      Mr. Brokaw, went on a fishing trip up to Grand Lake,
6      Colorado.  Mr. Hoodenpyle showed up and told us all that he
7      was under bond and he was able to do this, so he -- we
8      allowed him to stay with us.  Somehow the government found
9      out about that, and after we left they arrested him because
10     he was a fugitive, we didn't know that.
11         Mr. -- Mr. Kirsch believes because we know the
12     guy, we're going to act like him.  He's an idiot, he got us
13     involved with a lot of this stuff, and -- and not that I can
14     blame that on him, but I made my own choices.  I have made
15     better choices in the past few years, so I believe that I
16     can -- I can win my freedom on appeal, and I have no reason
17     to leave, except, of course, obviously there's a conviction
18     there and some possible jail time, but I have a wonderful
19     woman sitting in the back, I fell deeply in love with her
20     and would like to spend my time with her.  My mother is 92
21     years old and not in great health, and so I wouldn't -- I
22     would not go run away to her, because I surely would not
23     want to put her in any type of stressful environment where
24     the U.S. Marshals would be coming looking for me.
25             So there's no place for me to hide, and I think --

1    I think the proof is in the pudding.  Mr. Hoodenpyle was

2    captured after a while, he is gone.  I have no means of

3    supporting myself if I was on the run.  I have $26 in my

4    bank account, I have a 1996 Ford Thunderbird with almost

5    200,000 miles on it, so if -- I don't know how to hotwire a

6    car, so I couldn't even, if I had any wherewithal to steal

7    something, I would not be able to -- I don't have any

8    knowledge of that.

9         THE COURT: How do you -- how do you support

10   yourself now?

11        DEFENDANT PAWELSKI: Well, I have a part-time job

12   and my Social Security check.

13        THE COURT: Okay.

14        DEFENDANT PAWELSKI: Yes, ma'am.

15        THE COURT: Okay.  Part-time job and Social

16   Security.  Okay.

17        DEFENDANT PAWELSKI: So that --

18        THE COURT: Is that normal -- is that disability

19   Social Security or just --

20        DEFENDANT PAWELSKI: No, just standard Social

21   Security.

22        THE COURT: -- retirement?

23        DEFENDANT PAWELSKI: Yes, ma'am, I have

24   disabilities.  Well, nothing that is physical anyway.

25        THE COURT: Okay.

1           DEFENDANT PAWELSKI: Okay.  So that's -- that's my

2      statement.   I'll -- I'll continue to comply with the

3      probation officer as I've done in the past.  If you contact

4      Mr. Haberman (phonetic), I think he'll give me a glowing

5      report.  I've done everything that I was supposed to do,

6      call him, send him the monthly form.  I didn't get it out

7      this month because I was here, but I don't -- I don't have

8      any problem with him coming over to my house, and he's

9      inspected the home a couple of times.

10          THE COURT: Do you have phone service at your

11     house?

12          DEFENDANT PAWELSKI: Yes, ma'am.

13          THE COURT: All right.  Like a hardline phone?

14          DEFENDANT PAWELSKI: Yes.

15          THE COURT: The reason I'm asking is because there

16     are conditions of bond that would require what I loosely

17     refer to as an ankle bracelet, electronic monitoring.

18          DEFENDANT PAWELSKI: I had one of those on before,

19     ma'am, and because of my attitude, I think, and character,

20     and the fact that I did not violate the probation, it was

21     removed.

22          THE COURT: Okay.  So you started out with it and

23     then they --

24          DEFENDANT PAWELSKI: Yes, ma'am.

25          THE COURT: -- they --

1        DEFENDANT PAWELSKI: And it is a -- it is a burden

2    for me to be able to pay for that.  I still owe the last one

3    a couple hundred dollars, because I could only pay 25 or $30

4    a month on that, but I have been making regular payments to

5    that company.

6        THE COURT: All right.  I think there was some

7    indication about -- that caused some alarm to the court

8    about during the trial, behavior during the trial.

9        DEFENDANT PAWELSKI: Yes, ma'am, I understand that.

10        THE COURT: Do you want to tell me about that?  I

11    mean, I wasn't there, so I don't know.

12        DEFENDANT PAWELSKI: Well, I think I -- we have a

13    constitutional right to challenge jurisdiction, and that's

14    what we were doing, and Judge Arguello basically said if you

15    don't want to come here anymore, you don't have to.  But

16    when she called us up and said -- or sent the probation

17    officer, I guess, and gave us the motion to come to court

18    yesterday, we did.  We showed up this morning.  We did what

19    we were asked to do without any major argument, but we

20    challenged the jurisdiction and protested the way we felt we

21    had the right to do without causing -- well, without trying

22    to cause any issues for the court.

23        THE COURT: All right.

24        DEFENDANT PAWELSKI: So...

25        THE COURT: Anyone else want to speak or --

1          DEFENDANT BROKAW: Certainly.  I would -- I would

2     like to, Your Honor.  We might as well have a say today if

3     it's all right.  Can you hear me okay, Your Honor?

4          THE COURT: Yes, I can hear you.

5          DEFENDANT BROKAW: All right.  I feel the same way

6     Mr. Pawelski does.  This thing has been going on since

7     September of 2013 when we were originally arrested, and we

8     have complied with all of the processes and all of the

9     summons and everything during this time.  I have deep roots

10    in the community.  My wife of 48 years is sitting back

11    there, my children are all local, I got nowhere to go.  I

12    have -- I volunteer in the community, and I've got -- you

13    know, I've got a lot of contacts and, like I said, I have

14    deep roots here.

15         I have nowhere to go, and like Mr. Pawelski said,

16    I would plan -- the only -- the only strategy I would have

17    at this point would be to appeal the decision of the -- of

18    the court to a higher court, and I plan to do that, and it

19    would be much easier to do that unshackled and -- and, you

20    know, not incarcerated.

21         THE COURT: Where do you live?

22         DEFENDANT BROKAW: I live in Colorado Springs.

23         THE COURT: In the Springs, okay.  So when you're

24    talking about the community, it's that general community?

25         DEFENDANT BROKAW: Yeah.  Yes, yes.  And my wife

1    and I volunteer down there and we've got a lot of
2    connections through the church and stuff, so there's no way
3    -- there's nowhere we're going, I'm going.
4           Like -- like Mr. Pawelski said, Mr. Kirsch has
5    brought up a couple times about Mr. Hoodenpyle. Well, we
6    did know Mr. Ron Hoodenpyle, and he's the one that got us --
7    started with some of the -- some of these processes that got
8    us in a little trouble here, and we had no knowledge that
9    Mr. Hoodenpyle was on the run. He told us -- on this
10   fishing trip he contacted us and told us that he -- he was
11   bonded out, and we said if you want to stay with us for a
12   day, that's fine, and there were -- there were three other
13   folks with us. Five -- there was five of us altogether.
14          So -- so we had -- we had no knowledge that he was
15   -- he was fleeing anything at that point.
16          THE COURT: Did you, sir, just get a recent
17   passport card? Not a passport --
18          DEFENDANT BROKAW: I got a passport card, yes. I
19   did get a passport card, and I said right on the application
20   it was for identification only. I have no -- I have no
21   intention of fleeing anywhere, and I turned it in when they
22   told me to turn it in to the clerk down there, I did. So
23   I'm -- I mean, I have no passport card or anything. I've
24   got a driver's license now.
25          THE COURT: Colorado?

1           MR. BROKAW: Colorado, correct.  Correct.

2           And I did comply with all of the things.  I had a

3    relationship  with  James  Murphy,  he  was  the  probation

4    gentleman that I originally assigned to, and he got recently

5    promoted  up  to  the  Denver  area.   If  you  would  like  to

6    contact James Murphy, I mean, I'm sure he would give me a

7    good report, Your Honor, because I had a nice relationship,

8    I always did everything he asked me, and we had some very

9    nice discussions.

10           And  the  --  and  the  gentleman  that  I've  been

11   contacting most recently is Bob Ford down there.  I think he

12   would give me a good -- a good report also.  But -- but I

13   have no -- I have no intention of fleeing anywhere.  I plan

14   to stay here and defend myself and appeal this decision, and

15   in the event that I lose, I will suffer the consequences of

16   my actions.

17           THE  COURT:  Just  so  all  of  you  are  aware,  this

18   thing  I  just  read  you,  it's  release  or  detention  of  a

19   defendant  pending  sentence  or  appeal,  so  it's  the  same

20   standard both ways.

21           DEFENDANT BROKAW: Okay.

22           THE COURT: Technically you probably can't really

23   appeal  until  after  your  sentence,  so  I  know  you  filed  it

24   anyway,  but  probably  just  procedurally  you  have  to  be

25   sentenced first.

1          DEFENDANT BROKAW: I filed -- I filed a Writ of

2    Mandamus.

3          THE COURT: Okay.  Yeah, that's a little different.

4          So, yeah.  So I think -- so the standard's the

5    same for all of the rest of the proceedings, I think.

6          DEFENDANT BROKAW: Understand.

7          THE COURT: I'm sorry, I didn't mean to cut you

8    off.

9          DEFENDANT BROKAW: No, we -- I -- I think I've said

10   pretty much what I want to say.  I mean, I'm -- I am -- I

11   think my actions have proven that I'm not a flight risk.  I

12   think my -- my status in the community and my family

13   indicates that I'm not a fligh risk, and this is the only

14   time in my life I've ever been involved with anything like

15   this, there's no criminal record and nothing indicating that

16   I would be a flight risk.

17         My -- my background is my father and grandfather

18   and my great uncle were all lawyers and judges.  I have a

19   great -- deep respect for the judicial system in this

20   country, so I'm not going to be a flight risk.

21         THE COURT: All right.

22         Ms. Vigil, do you -- do you want to say anything?

23         DEFENDANT VIGIL: I do, I want to ask Mr. Kirsch

24   why he thinks I'm a flight risk.  What have I said or done

25   that gives you that opinion?

1            THE COURT: Well, Ms. Vigil, the problem is in

2     court Mr. Kirsch can't really talk to you.

3            DEFENDANT VIGIL: Oh, okay.

4            THE COURT: If you had a lawyer, he couldn't really

5     talk to your lawyer either.

6            DEFENDANT VIGIL: Okay.

7            THE COURT: Everybody's got to talk to me --

8            DEFENDANT VIGIL: Okay.

9            THE COURT: -- that's kind of the protocol.

10           DEFENDANT VIGIL: Well, I don't understand why I

11    would be considered a flight risk.

12           THE COURT: Yeah, and --

13           DEFENDANT VIGIL: I don't have anywhere to go

14    either.  I've been -- yeah, I'm a native of Colorado, been

15    in Colorado Springs all my life and have a business to run,

16    and I have a lot of involvement in the community that, you

17    know, I just -- and I don't have the means to go anywhere

18    either, so I would not try to attempt that.  I mean, that,

19    to me, just would be asking for more trouble than it's

20    worth, so I just want to go home and be with my kitty cat

21    tonight and be able to formulate an appeal also, and work on

22    this case so that we can do what we can, considering that

23    we've been found guilty now and things like that.

24           And I have no criminal history either.  You know,

25    this is the first time I've been involved in the system like

1    this, so I don't know -- you know, it's all foreign to me
2    right now, and I have no intentions of doing anything except
3    do what I need to do and be here for the sentencing, because
4    I will --
5             THE COURT: How about your understanding of what
6    went on in the trial, because I think that's causing
7    everyone quite a bit of pause, that you weren't willing to
8    participate or be there or -- and I don't know the details
9    because I wasn't there.
10            DEFENDANT VIGIL: Well, we had attempted, let's put
11   it that way, to voice our opinion and voice our stand, and
12   that's what brought all that up.
13            THE COURT: All right.
14            DEFENDANT VIGIL: And at this point, we're not
15   doing that, so we're dealing with what is now, because at
16   that point we didn't have this -- we weren't in this
17   situation.
18            THE COURT: Right.
19            DEFENDANT VIGIL: And now the situation has changed
20   and we have to change our mindset.
21            THE COURT: Okay.  Let me ask the probation officer
22   to give me some insight on -- and I understand you didn't
23   actually supervise any of these three, right?
24            MR. STREICH: Correct, Your Honor.
25            THE COURT: But let us know from the probation

1    office's viewpoint how they've done on bond.

2              MR. STREICH: Your Honor, I spoke to Dennis Cormany

3    (phonetic), who's a supervisor down in the Colorado Springs

4    office who oversees the officers that have supervised these

5    individuals, and prior to this hearing Mr. Cormany did

6    advise that it would be the recommendation of the office at

7    this time that all three defendants be detained pending

8    sentencing due to risk of flight.

9              I was reviewing some case notes on the defendants,

10   and just yesterday, on November -- I think November 6th, a

11   couple of our officers proceeded to Mimi Vigil's house, the

12   door was slightly ajar.  One of the officers knocked, the

13   defendant answered but declined to let us in.  That in and

14   of itself raises concern for us, for officer safety.  It was

15   noted previously a USPO had identified two firearms in the

16   residence of Mrs. Vigil.  That's the most recent example,

17   and in talking to the officers on all three, there's been

18   issues with kind of running the program how they want to run

19   it, whether it be showing up late, not calling when they're

20   supposed to call, although still calling.

21             So again, it is recommended at this time from who

22   I spoke to down in the Colorado Springs office that the

23   defendants be detained, Your Honor.

24             DEFENDANT BROKAW: Sir -- am I allowed to address

25   him, Judge, or are you?

1          THE COURT: No, but you can ask me.

2          DEFENDANT BROKAW: I take exception to that.  I

3    didn't know of anything on my record.  There was -- there

4    was a couple of call issues, I've called a couple times.

5    Mr. Ford had called me, we were advised that we didn't have

6    to be in court, but we needed to call the court, and I

7    emailed him and the email bounced, and then I did call in

8    later, and he tried -- in the meantime, he tried to call me,

9    but -- but that instance, but the other instances of

10   calling, I've never had any -- any concern at all.  Mr. Ford

11   has never told me anything, and Mr. Murphy before him, we

12   had a great relationship.  I said when do you want me to

13   call, he said well, call me once a week, or call me, you

14   know, every -- every other Wednesday, or, you know, and

15   that's the way it was, and I always responded to that, so I

16   don't know why there would be a report such as that in my

17   name.  I've always done what they told me.  And like Mr.

18   Pawelski, I was on a monitor bracelet for the first four

19   months of this also.

20         THE COURT: Mr. Pawelski, who was your probation

21   officer?

22         DEFENDANT PAWELSKI: Mr. Haberman, and I'm -- I'm

23   just shocked, because I've called him every Monday, and most

24   of the time I had to leave a message for him, so maybe he's

25   not getting the message, I don't know, and he's on extension

1   206, and he just says Rob Haberman with the U.S. Probation

2   Office, I say Rob, this is John Pawelski, just calling in

3   for my Monday call, I'm doing fine, and then I hang up.

4           So I don't -- he's never called me in.  He's never

5   come to my home and said you haven't called, you haven't --

6   so, I mean, I got him, I don't know why that (inaudible) the

7   supervisor is saying that.  I have no idea why.

8           THE COURT:  Ms. Vigil, who was your probation

9   officer?

10          DEFENDANT VIGIL:  Lynn -- I can't remember her last

11  name, and I -- the two weapons that were found, one was from

12  a roommate who said he didn't have one, and then it turns

13  out he did have one that I didn't know of, and the other one

14  was from a boyfriend who was living with me, and I had no

15  idea he had one, so those were both very much a surprise to

16  me.

17          And then when they came to my door the other day,

18  I told them come in, and they kept knocking, so I finally

19  went to the door, and I wasn't sure who they were, because

20  it was a new guy, it wasn't Lynn, I know who Lynn is.  Lynn

21  had been there the week before, I think.

22          THE COURT:  Lynn -- Lynn is a female?

23          DEFENDANT VIGIL:  Yes.  And --

24          THE COURT:  Do you know who that is?

25          MR. STREICH:  I do, Lynn Depezzi (phonetic), Your

1          Honor.

2                    DEFENDANT VIGIL: Oh, yeah.

3                    MR. STREICH: She's an officer in the Colorado

4          Springs office.

5                    THE COURT: All right.  Are -- are those officers

6          around today?  Have you had a chance to talk to them and

7          catch up with them?  I'd like to hear from them

8          individually.

9                    MR. STREICH: I know Bob Ford is in the office

10         today, Mr. Murphy is downstairs.  Travis, the supervisor, is

11         in the Colorado Springs office as well.

12                   THE COURT: Is -- is -- Travis is Cormany, right?

13                   MR. STREICH: Travis Cormany is the supervisor,

14         Your Honor.

15                   As far as -- I'd have to check.  Robert Haberman

16         is in the office as well in Colorado Springs, and it looks

17         like Lynn Depezzi might actually be up here in Denver for

18         court.

19                   THE COURT: Okay.

20                   DEFENDANT BROKAW: Your Honor?  If Mr. Murphy's

21         downstairs, I would really appreciate it if you'd get a

22         comment from him, if you could.

23                   THE COURT: I am, I'm going to call them all.

24                   DEFENDANT BROKAW: Okay.  Thank you.

25                   THE COURT: Yeah.  That's why I'm asking, I'm going

1    to call everybody and get the direct report from them so

2    that we don't have to have just an overview.  I don't want

3    to -- and I'm not suggesting this is true, but if one of you

4    has not been complying and the other two have, I don't want

5    to paint you all with the same brush just because you're

6    here in this case, you know.  You each have a right to an

7    individual bond determination.

8              So let me ask the government to state its

9    position, please, on the record.

10             MR. KIRSCH: Your Honor, we're not arguing that

11   these defendants don't have ties to the community or

12   anything like that, clearly they do, and we're not arguing

13   on the basis of criminal records, we're arguing on the basis

14   of the position that these defendants have taken from the

15   beginning of this investigation, not just the beginning of

16   the charges, which is that they're not subject to the

17   jurisdiction of the United States District Court, and

18   they're not subject to the jurisdiction of magistrates, that

19   they're not even the defendants, that they -- that these

20   people are not the defendants.  They've made claims that the

21   true defendants are some sort of corporate entities that

22   they claim exist that are associated with their names when

23   they're spelled in all capital letters, and they've

24   consistently demonstrated a disregard for the authority and

25   the orders issued by this court.

1          That pattern began when Magistrate Judge Watanabe

2     issued a search warrant that was executed at the residence,

3     two different residences where the three of these defendants

4     were then living.  Mr. Pawelski and Mr. Vigil (sic) were

5     living at one residence, and Mr. Brokaw was living at the

6     other.  The defendants' response to the execution of those

7     search warrants was to file documents under the heading of

8     the  search  warrant  case  that  they  captioned  "Criminal

9     Complaints," and they named as defendants in those criminal

10    complaints  various  people,  including  Magistrate  Judge

11    Watanabe.

12          Throughout  the  proceedings,  as  I  said  before,

13    they've continued to challenge the idea that the court has

14    any jurisdiction over them.  Mr. Pawelski, at the time of

15    his arrest on the charges in these cases, made statements to

16    the defendant -- excuse me, made statements to the arresting

17    agents  indicating  that  he  was  --  his  belief  that  he  was

18    being kidnapped at the time.

19          During the -- the Court's already pointed out the

20    fact that Mr. Brokaw obtained a passport card while he was

21    out on bond, that was a direct violation of his conditions

22    of  release,  which  was  that  he  not  obtain  any  new  travel

23    documents.  He did in fact surrender that card back to the

24    court after he was asked to do so.  During the trial, at the

25    beginning of the trial, all three of the defendants were

1    repeatedly ignoring orders from Judge Arguello with respect

2    to their conduct within the courtroom.  They were refusing

3    to follow instructions from Judge Arguello, they were

4    talking over Judge Arguello.  At one point, all three of the

5    defendants began to walk out of the courtroom while the jury

6    was in the process of being put into the jury box.  They

7    were stopped and they were then given a choice by Judge

8    Arguello to participate in the proceedings without being

9    disruptive or to spend the rest of the day in the marshals'

10   holding cell.  The defendants indicated that they could not

11   consent to participating in the jury trial, and they

12   therefore spent most of the rest of that day in the

13   marshals' holding cell.

14        At the end of that first day of trial, they were

15   brought back into court and Judge Arguello advised them that

16   both Supreme Court precedent and the Rules of Criminal

17   Procedure would allow the trial to proceed without them if

18   they voluntarily chose not to come, and she gave them an

19   order that if they decided not to come back the next day,

20   that they needed to call their probation officers before 8

21   a.m. the next morning and let them know they were not going

22   to be there.  The information that the government has is

23   that Ms. Vigil sent an email to her probation officer that

24   night indicating that she was not planning to come.  Neither

25   Mr. Pawelski nor Mr. Brokaw made the telephone calls that

23

1    Judge Arguello had required.

2         On the third day of trial, Judge Arguello issued

3    an order -- I should back up.  On the first day, Judge

4    Arguello also indicated that she was going to require the

5    defendants to come back in connection with the receipt of a

6    verdict.  On the third day of trial, Judge Arguello issued

7    a written order that notified the defendants that if they

8    wanted to present any sort of evidence, they needed to

9    appear at 8 o'clock on the next day, which was Thursday,

10   yesterday.  If they didn't want to present any evidence,

11   they needed to appear at 1 o'clock.  The defendants did

12   appear at 8 o'clock.  They did participate in the trial on

13   the last day.  There were still, however, various instances

14   in which they were not at least immediately following

15   directions that Judge Arguello was giving to them about how

16   they should conduct themselves within the courtroom and what

17   kinds of things they could say, arguments that they could

18   make, that sort of thing.

19        They did in fact come back for the verdict this

20   morning.  They did not -- they did not come up and sit at

21   the counsel table, they were sitting back in the back of the

22   courtroom while the verdicts were read, and so that's sort

23   of the pattern of activity that we have with respect to this

24   case.

25        Just to put a little bit more information with

1    respect to Mr. Hooden -- Mr. Hoodenpyle, the person that Mr.

2    Brokaw and Mr. Pawelski referenced, that incident does cause

3    the government concern.  Mr. Hoodenpyle was a member of the

4    same group that these defendants have been a member of, it's

5    a version of a group called the Republic of the United

6    States of America, which is generally identified as a

7    sovereign citizen group.  Mr. Hoodenpyle was convicted of

8    filing a false lien against a revenue officer's home, he was

9    ordered to surrender for service of sentence, he failed to

10   do that, and he was arrested at a cabin in Grand Lake,

11   Colorado, where Mr. Brokaw and Mr. Pawelski both were.

12        The sort of history of this group's activities is

13   that they make extensive use of the court system.  The

14   defendants have demonstrated their ability to follow court

15   cases through PACER and a variety of other means, so the

16   government does not have direct evidence that Mr. Pawelski

17   or Mr. Brokaw knew Mr. Hoodenpyle was a fugitive at the time

18   that he was there at their cabin, but we would suggest that

19   the Court could draw an inference that they knew that

20   because of their close association.  Mr. Hoodenpyle's name

21   appeared on many of the fraudulent documents as a witness or

22   a surety for the defendants that were just admitted into

23   evidence at the trial of this matter.

24        Mr. Hoodenpyle, at the time he was arrested, also

25   had in his possession items including an identification card

1     with his picture but someone else's name on it, and a copy

2     of a book that was titled "How to Change Your Identity."  So

3     given the nature of that close relationship, the government

4     thinks that it's fair to draw the inference that these

5     defendants did in fact understand Mr. Hoodenpyle's status,

6     and that they were essentially helping harbor a fugitive.

7     For all of those reasons, the government believes that the

8     defendants have not overcome the burden that is now theirs

9     to demonstrate that they are not flight risks.

10           If the Court disagrees with that conclusion, then

11    the government would strongly advocate for putting them, all

12    three defendants, back not on electronic monitoring, not on

13    the regular electronic monitoring but on GPS location

14    monitoring, so that the government is in a position to be

15    able to determine the exact locations of the defendants

16    should they fail to appear for future court proceedings.

17           MR. BROKAW: Your Honor, I take exception with Mr.

18    Kirsch's comparison of -- of my relationship with Mr.

19    Hoodenpyle, that is all wrong.  Yeah, there were -- there

20    were a lot of people, and it was more -- and I also take

21    exception with the term "sovereign citizens."  There were a

22    group of people numbering in the thousands that had studied

23    the Constitution and were -- and were studying and working

24    on processes to make sure that, for example, local -- local

25    sheriffs and local county officials abide by their oath of

1      office, and the spinoff to that is Oath Keepers.  I mean, we

2      work with groups like that, if you're familiar with them.

3              I mean, so it wasn't a sovereign citizen group, I

4      object to that terminology.  Mr. -- and far as Mr.

5      Hoodenpyle goes, our relationship with him went back, and --

6      and like Mr. Pawelski said, I haven't seen or heard from Mr.

7      Hoodenpyle for a couple of years, I don't know what became

8      of him, and we were not -- we were not that close of

9      friends.  Although we knew him pretty well back in those

10     days, we were not that close of friends, and to -- and to

11     assume that I would be a flight risk because Mr. Hoodenpyle

12     did some stupid things is -- is not a fair comparison or

13     assumption.

14             I -- you know, I'm me, I'm not Mr. Hoodenpyle.  I

15     don't know where he is right now.  I haven't seen him for a

16     long time, and certainly a comparison between me and him is

17     not accurate.  As far as following cases on PACER, the first

18     time I ever got on PACER was when I was involved in this

19     case.  The first time I knew -- knew how to use it or

20     anything like that.  I have never done anything like that in

21     my -- in my life before.  But anyway, that's my comment.

22             THE COURT: Okay.  Well, like I said, I -- I do

23     want to talk to -- since most of the probation officers that

24     actually supervised each of you are available, I want to

25     talk to them before I make any kind of decision in this

27

1    matter, so I think what we should probably do is break and

2    come back.

3            Ma'am?

4            MS. BROKAW: Excuse me, Your Honor.  I am the

5    spouse of Mr. Brokaw.  Would I be able to say a few words?

6    Excuse me.

7            THE COURT: I'll let you say a couple of words if

8    what you're going to talk about is whether or not I find

9    that he's a flight risk --

10           MS. BROKAW: Right.

11           THE COURT: -- or a danger to the community.

12           MS. BROKAW: Yes.

13           THE COURT: If that's what you want to address,

14   yeah.  If you want to make a speech, though, don't do that

15   right now, okay?

16           MS. BROKAW: No, it's not a speech.

17           THE COURT: All right.  Go ahead and come up.

18           MS. BROKAW: Well, all three of these individuals

19   are still employed -- excuse me -- and they could have time

20   to get their affairs in order.  From the beginning, the

21   probation officers couldn't understand why his clients had

22   ankle bracelets on and pretty left them alone.  He said his

23   clients were murderers, rapists, and drug dealers.  None of

24   these individuals have any criminal background whatsoever.

25   And on a personal note, our 48th wedding anniversary is

1    coming up in December, so that would be nice if we were able

2    to spend it together.   Excuse me, I'm having a terrible

3    time.

4              As my husband stated, we attend church twice

5    weekly, and we volunteer at a mission for the homeless and

6    low income individuals, and it's -- we put in more time this

7    time of year coming up with Christmas and Thanksgiving

8    baskets, and after their ankle bracelets were removed, that

9    they mentioned earlier, they did not try to flee, and they

10   knew all these individuals seated here, and probably many,

11   many times more were stacked against them and they did not

12   flee.

13             As far as the calls or checking with the probation

14   officer, numerous times we got calls at 2 in the morning, at

15   5 in the morning asking my husband where he was when he was

16   lying in bed next to me, and they determined that the area

17   we live in is kind of down in a low point and that maybe the

18   signal was bouncing off the hills, I don't know, and we got

19   permission to go to a Christmas program from Mr. Murphy, and

20   my husband got called at that Christmas program and asked

21   where he was, why he wasn't home, and he said I got

22   permission from Mr. Murphy.   In that instance, and several

23   other instances, Mr. Murphy apologized to my husband and

24   said he didn't get the message, or he didn't get the message

25   in time.

1          Okay.  And lastly, there is supposed to be a
2     wedding taking place this fall between Mr. Pawelski and his
3     fiancé, so if you could give them the time to do that.
4     Thank you for your time.
5          THE COURT: And, Ms. Brokaw, are you -- you're the
6     -- you're the wife of Mr. Brokaw.
7          MS. BROKAW: Correct.
8          THE COURT: Are you related to any of the other two
9     defendants?
10         MS. BROKAW: No, not at all.
11         THE COURT: So there's no blood relationship there?
12         MS. BROKAW: No.
13         THE COURT: All right.  You just know them from the
14     community or --
15         MS. BROKAW: I know them through my husband.
16         THE COURT: Okay.  I'd like to give each of you a
17     short opportunity before we recess, and I'm going to -- what
18     I'm going to do is eat at my desk and talk on the phone to
19     the probation officers so that you know what's happening,
20     but I'd like to know your response to what I think really is
21     the concern of the government and of Judge Arguello, and
22     mine too, and that is this insistence that you don't have to
23     recognize us.  I mean, I -- I understand it, and I'm not
24     trying to get you to change your mind, that's not what I'm
25     here for, but what I am going for is if I put you out on

30

1    bond, usually what I do  with people is I'm signing the

2    bond, and I say okay, you and I are on this together, and

3    you're promising that you will abide by these conditions of

4    bond, but if you don't recognize my authority to give you a

5    bond, then I -- you know, how can I put you on bond?  Do --

6    do any of you want to speak to that at all?

7              DEFENDANT PAWELSKI: I'll be -- I'll glad to answer

8    that.

9              THE COURT: All right.

10             DEFENDANT PAWELSKI: We would have a legal and

11   binding contract at that time, which would be under the

12   First Amendment of the Constitution, and that legal and

13   binding contract would be some parameters that we agreed on,

14   whether that be, in my opinion, under duress or whatever.

15   The fact is, we've had this before, and we've had the same

16   viewpoint throughout this whole process.  Our viewpoint

17   should not be put on trial and say we're not -- we're going

18   to run away because -- well, that just doesn't make any

19   sense.

20             If -- if we didn't have a nation of laws and a

21   nation of people that would question the government

22   throughout the history of our country, where would we be

23   today?  We would be under a tyranny, because people that

24   were questioning the government were men like Thomas

25   Jefferson and Ben Franklin, and they brought together a

1    document that has been unchangeable for the 200 and some

2    years our country's been (inaudible) here.

3         We believe in that Constitution.  We believe that

4    it is right.  Whether we believe Mr. Kirsch and Ms. Pollock

5    have (inaudible) over us, or the district does, should not

6    change the fact that we're not going to come in and present

7    a legal, lawful argument in our defense.  Like we said, we

8    have nowhere to go.  We have no financial capability of

9    going.  They only thing we can do is stand on our

10   constitutional rights to use the court system in the best

11   manner we know how.  And if -- if our -- our methods are not

12   the legal standard, if you will, then I will apologize for

13   that, because we are not trained attorneys.

14        And again, Mr., you know, Kirsch said PACER.  I

15   agree with Mr. -- with Tom, is that I've never even heard of

16   PACER until we got into this.  I had to go sign up for it,

17   and I didn't even know how to do that.  I had to call the

18   court and ask them how to -- the clerk and say what do I got

19   to do here so I can track this stuff.  So we had no idea

20   what Mr. Hoodenpyle did at the time.  He is gone, we have

21   had no contact with him, I don't want any contact with him.

22   I don't know what else I could tell you, Judge, to make you

23   believe that I will be here on January 28th at 3 o'clock, I

24   think it is.

25        THE COURT: But you would feel that if you and I

1    signed the bond paperwork, that that was an agreement that

2    you're making to come back here, whether -- whether you

3    agree with the jurisdiction or not --

4         DEFENDANT PAWELSKI: Absolutely.

5         THE COURT: -- you're agreeing yourself to come

6    back --

7         DEFENDANT PAWELSKI: Absolutely.

8         THE COURT: -- and abide by the conditions.

9         DEFENDANT PAWELSKI: Yes, ma'am.

10        THE COURT: All right.

11        Ms. Vigil?

12        DEFENDANT VIGIL: We want to stay in honor, and

13   that would be staying in honor once we have that contract.

14        THE COURT: Okay.  Mr. Brokaw?

15        DEFENDANT BROKAW: Likewise, Your Honor.  I'm

16   looking at you right now, and I recognize you're there, and

17   I feel the same way.  And I'm not a flight risk, I won't --

18   I give you my solemn promise right now, I won't -- I won't

19   flee anywhere, I'll be here on January 28.  The concerns of

20   the government are not founded on any knowledge of my

21   behavior, my personal behavior.

22        Yes, we -- we have some strong feelings about the

23   Constitution and about our rights under the Constitution.

24   Perhaps we need to alter some of those positions a little

25   bit, but if I have a contract with you, Your Honor, I will

1    honor that.

2            THE COURT: All right.  Well, let me take a recess

3    now, and I do want to talk to the probation officers that

4    are available and get their take on how -- how you've done

5    on bond up to this point.

6            And when is good for the government?  Can you come

7    back, like, at 3 or --

8            MR. KIRSCH: Yes, Your Honor, we can.

9            MS. PALUCH: Certainly.

10           THE COURT: Okay.  So, Marshals, we will reconvene

11   this matter then -- is that good on our calendar?

12           THE CLERK: Uh-huh.

13           THE COURT: Okay.  -- at 3 o'clock this afternoon.

14           DEFENDANT PAWELSKI: Thank you.

15           THE COURT: All right.  We'll be in recess.

16

17           (Whereupon,  the  within  hearing  was  then  in

18   conclusion at 1:18 p.m. on November 7, 2014.)

19

20           I  certify  that  the  foregoing  is  a  correct

21   transcript, to the best of my knowledge and belief, from the

22   record of proceedings in the above-entitled matter.

23

24       /s/ Bonnie Nikolas                    June 10, 2015

25       Signature of Transcriber                    Date


            AVERY/WOODS REPORTING SERVICE, INC.
      455 SHERMAN STREET, SUITE 460, DENVER, CO  80203
                      303-825-6119